UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEDAL EL-SAYED,

                Plaintiff,                          Case No: 13-12458

vs.                                        HON. AVERN COHN

BANK OF AMERICA, N.A.,

                Defendant.
_____/

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT (Doc. 18) AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (Doc. 19) AND DENYING PLAINTIFF'S
MOTION FOR DEFAULT JUDGMENT (Doc. 35) AND
DISMISSING AS MOOT DEFENDANT'S MOTIONS
TO STRIKE (Docs. 31, 42) AND DISMISSING CASE**

**I. INTRODUCTION**

In this diversity action, the Plaintiff Nedal El-Sayed ("Plaintiff"), a licensed Michigan real estate agent, claims that the Defendant Bank of America, N.A. ("Defendant") unlawfully placed Plaintiff on a "Watchlist," a list which excludes Plaintiff from doing business with Defendant, i.e. Defendant no longer accepts mortgage transactions in which Plaintiff is involved either directly or indirectly. Plaintiff claims:

Count I          Tortious Interference With Business Relationship Or Expectancy

Count II        Tortious Interference With Contracts

Count III       Business Defamation

Count IV      Individual Defamation[1]

---

[1] Plaintiff also claimed Unfair Business Competition In Violation Of The Sherman Act (Count V) and Unfair Competition In Violation Of Michigan Antitrust Law (Count VI). These counts have been dismissed with prejudice by stipulation. (Doc. 26).

Now before the Court are multiple motions:

>Plaintiff's Motion For Summary Judgment (Doc. 18)

>Bank Of America, N.A.'s Motion For Summary Judgment (Doc. 19)

>Bank Of America, N.A.'s Motion To Strike Exhibit P To Plaintiff's Motion For Summary Judgment (Doc. 31)

>Plaintiff's Motion For Entry Of Default Judgment For Defendants' Failure To Comply With Discovery (Doc. 35)

>Bank Of America, N.A.'s Motion To Strike Exhibits A And B To Plaintiff's Reply In Support Of His Motion For Summary Judgment Or, In The Alternative, For Leave To File Its Sur-Reply (Doc. 42)

For the reasons that follow, summary judgment will be granted to Defendant and denied to Plaintiff. Defendant's motions to strike Exhibits A, B and P will be dismissed as moot. And Plaintiff's motion for an entry of default will be denied.

## II. BACKGROUND

### A. Factual Background

Plaintiff is a licensed Michigan real estate agent. Much of Plaintiff's business is facilitating short sale transactions where a client of Plaintiff's purchases or sells a home for less than what is owed on the outstanding mortgage. Plaintiff, in the course of his business, deals with Defendant because any short sale transaction involving property encumbered by a mortgage held by Defendant requires Defendant's express authorization and approval. Also, Defendant provides loans to purchasers involved in short sale transactions.

Prior to November of 2012, Plaintiff was employed at Elias Realty. He worked there for approximately a year-and-a-half. At some point, William Elias ("Elias"), Plaintiff's colleague and friend—also the owner of Elias Realty—was placed on an "Exclusionary List"

2

by Federal Home Loan Mortgage Corporation ("Freddie Mac") which prevented him from doing business with Freddie Mac.  Freddie Mac places on its Exclusionary List "[p]ersons or entities whose conduct presents an undue risk to Freddie Mac."  (Doc. 18-2 at 2).  The purpose of the Exclusionary List is "to protect the integrity of [Freddie Mac's] mortgage purchase and servicing functions." (*Id.*).  A person or entity placed on the Exclusionary List is "prohibited from doing business with Freddie Mac, either directly or indirectly."  (*Id.*).

Freddie Mac communicated to Defendant that Elias was on Freddie Mac's Exclusionary List.  As a result, Defendant began an investigation of Elias, eventually placing Elias on its "Watchlist," the equivalent to Freddie Mac's Exclusionary List.  (Doc. 19-3 at 15) (Defendant explains to Elias that it has confirmation that Elias "is operating an illegal loan modification company.").

To be placed on Defendant's Watchlist, an individual or entity is first referred to Defendant's fraud investigation group.  After the fraud investigation group determines that there is evidence of wrongdoing, a referral is made to Defendant's Watchlist Manager Steering Council (the "Watchlist Council") for placement on the Watchlist.  Defendant's business control manager and member of the mortgage fraud prevention department, William Schnieders ("Schnieders"), testified at his deposition that placement on the Watchlist is determined by a super majority council vote.  (Doc. 18-6 at 69).  It is not clear from the papers the members who comprise the Watchlist Council.  In sealed exhibits showing the Watchlist Council's meeting minutes, a list of the council members appears but there is no explanation of who the members are or a description of their positions.

In November of 2012, Plaintiff left Elias's company because he could not "close any of my buyers' deals under the Elias name." (Doc. 18-5 at 57).  Plaintiff believes that he lost

3

"roughly around twenty buyer deals" because of Elias' inclusion on Freddie Mac's Exclusionary List.

After leaving Elias's company, Plaintiff started his own company. Plaintiff retained some of Elias Realty's former clients to represent them in short sale transactions. Plaintiff says that the clients independently decided to hire him. This raised a concern with Defendant because Elias was already on its Watchlist.

Some time after Plaintiff left Elias Realty, Defendant began investigating Plaintiff. Defendant's employee, Harolyn Hall ("Hall"), a member of Defendant's mortgage fraud prevention department, testified at her deposition that it came to the Watchlist Council's attention that Plaintiff "was working Elias's pipeline" meaning that Plaintiff had taken over Elias's files. (Doc. 18-4 at 50). Hall testified that the prior issues Defendant had with Elias and the belief that Plaintiff was taking over Elias's files served as "triggers" for Defendant to begin investigating Plaintiff. (*Id.*). During the investigation, Hall uncovered policy violations committed by Plaintiff. In regards to a specific short sale at 7420 Dolphin, Detroit, MI (the "Dolphin Property"), Hall determined that Plaintiff both purchased the property and earned a commission. (*Id.* at 53).

After learning that Plaintiff purchased the Dolphin Property and earned a commission for a short sale of the property, Defendant informed Plaintiff that it would no longer accept mortgage transactions in which he was involved in either directly or indirectly, i.e. that he was placed on the Watchlist. In a letter dated March 11, 2013, Defendant informed Plaintiff, in part:

> This letter is informing you that Bank of America will no longer be accepting mortgage transactions in which you are or have been involved either directly or indirectly. All such loans are ineligible to close. This decision is due to the

4

reasons summarized below which violate Bank of America's requirements.

Subject property: 7420 Dolphin, Detroit, MI 48239
Summary:
- On 10/30/2012, Nedal El-Sayed signed a Short Sale Real Estate Licensee Certification reflecting that he had no relationship to the subject property buyer when in fact Nedal El-Sayed was the owner of the buyer company.
- Nedal El-Sayed earned a commission on the purchase of the subject property in which he was the negotiator and the buyer.

The status and findings may be refuted by submitting a written response, including any supporting documentation using one of the specified methods below.  Any such response and documentation must be received by Bank of America within forty-five (45) calendar days after the date of this notice. Bank of America reserves the right to review and issue a final decision upon the receipt of the aforementioned documentation.

(Doc. 18-7 at 2).

Plaintiff responded to Defendant "emphatically deny[ing] the[] allegations as untrue and unfounded" and demanding that the allegations "be retracted and my status with Bank of America restored."  (Doc. 18-8 at 2).  Citing to multiple exhibits, Plaintiff explained to Defendant that he was the buyer of the Dolphin property (through Adam Holdings LLC – Nedal El-Sayed)—a fact fully disclosed to all involved in the transaction—but that he did not receive any commissions and he was mistakenly listed as the buyer's agent.  (*Id.* at 2).

Although Plaintiff cleared up the issues related to the Dolphin Property, he remained on Defendant's Watchlist.  Schnieders testified at his deposition that, although he initially recommended to the Watchlist Council that Plaintiff be removed from the Watchlist because Plaintiff's letter adequately addressed Defendant's concerns, the council decided that there was additional information requiring Plaintiff to continue on the list.  (Doc. 18-6 at 68–69).  Schnieders explained at his deposition when responding to a question:

Q.     To your knowledge why then wasn't Mr. El-Sayed removed or why

5

wasn't his status on the exclusionary list changed at that point?

A.     Because I don't have the authority to change status.  I need a majority, super majority vote of the council to change status.  So once we had the vote that was not unanimous and was vetted.  After it was vetted there was additional information that was provided by our fraud investigations group on that call that made it necessary for us to send out a secondary vote due to the additional information that was provided by the fraud investigations group.

(*Id.* at 69).

Part of the reason that Plaintiff continued on the Watchlist is because the council believed that Plaintiff (1) assisted his clients in "Buy and Bail" activity, meaning that he helped buyers acquire new homes and walk away from their old "underwater" homes;[2] (2) was involved in multiple transactions with a company affiliated with Elias—Moody Keegan Nelson & Associates ("MKNA"); and (3) issued a check to Elias on February 5, 2013, in the amount of $15,373.45, with the word "commissions" written in the memo line (Doc. 18-2 at 2).

Plaintiff contends that he did not engage in any of this activity, and, even if he did, it does not violate any of Defendant's policies and could not serve as a justifiable basis for including him on the Watchlist.   Plaintiff, citing to Defendant's "Watchlist Manager" documentation detailing criteria for placing individuals or entities on the Watchlist (Doc. 18-9), contends that placement on the Watchlist is exclusively reserved for:

---

[2] At her deposition, Hall described "Buy and Bail" activity as follows:

Buy and bail is when a borrower who has a home with a mortgage purchases another property while still maintaining the payments on the previous [loan] and then turns around, stops making payments on that previous loan and try to sell the property claiming a hardship.

(Doc 18-4 at 32).

- • perpetrating and committing fraud

- • actions or attempts to mislead, deceive, or defraud

- • convictions in a confirmed scam/crime

- • fabrications or document forgery

- • perpetrating identity theft

- • HUD, LDP, GSA or Exclusionary List matches

Defendant disputes that this is an exhaustive list or that it is bound by this criteria.

The Watchlist Council's April 2, 2013 meeting minutes show that the council was concerned that Plaintiff may have been making payments to Elias "under the table," and a vote whether to continue Plaintiff on the Watchlist was postponed until the next meeting. (Doc. 18-13 at 4).  After the next meeting, the council voted to keep Plaintiff on the Watchlist.  Plaintiff has been on the Watchlist continuously since March 11, 2013.

In a letter dated April 19, 2013, Defendant informed Plaintiff:

We are in receipt of your response to our letter dated March 11, 2013 regarding your status.  We have considered the information you provided and our decision pertaining your status remains unchanged.  Bank of America will no longer be accepting mortgage transactions in which you are or have been involved either directly or indirectly.  All such loans are ineligible to close. This matter is considered closed.

(Doc. 1-2 at 119).

Although Plaintiff was a part of multiple short sale transactions involving Defendant at the time, including 12 of which were already approved by Defendant, Defendant terminated all of the transactions.  Defendant sent "decline letters" to Plaintiff's clients informing them as follows:

We have received your request to complete a short sale on your property. We are sorry to inform you that we are unable to approve your request for the

7

reason provided below:

Decline – Failed Internal Quality Review.

(Doc. 18-16).

In addition, Plaintiff contends that Defendant contacted some of Plaintiff's clients directly and told them not to do business with Plaintiff.  Plaintiff cites an e-mail sent by Rob Beatenhead ("Beatenhead"), a buyer of a home in a short sale transaction, to Christopher Flynn ("Flynn"), Plaintiff's associate:

> Chris,
> I spoke to Bank of America today and they informed me that your company
> was informed by them a month ago that you could not close sales with them.

(Doc. 18-17, Exhibit P).[3]  Plaintiff says that, since Defendant began informing Plaintiff's clients not to do business with Plaintiff, they have terminated their relationships with Plaintiff.  Plaintiff testified at his deposition that he is not banned from doing business from any other major banks—besides Defendant—including Fannie Mae and Freddie Mac. (Doc. 19-2 at 37).

**B. Procedural History**

Plaintiff filed this action in Wayne County Circuit Court.  Defendant removed to this Court on the basis of diversity.  (Doc. 1).

The parties filed cross motions for summary judgment (Docs. 18, 19).

In addition, Defendant filed a motion to strike Exhibit P to Plaintiff's motion for summary judgment (Doc. 31) as well as a motion to strike Exhibits A and B to Plaintiff's reply brief (Doc. 42) on the grounds that these exhibits were not timely disclosed in

---

[3] Defendant challenges Plaintiff's reliance on this e-mail and moved to strike the exhibit. (Doc. 31).  As will be explained, Defendant's challenge is moot.

discovery.

The Court held a telephonic status conference with the parties regarding a discovery dispute on May 19, 2014. The Court required Defendant to turn over to Plaintiff certain documents. Plaintiff says that Defendant has not turned over these documents, and, as a result, has filed a motion for an entry of default as a sanction (Doc. 35).

The motions are ready for decision.

### III. DISCUSSION

As explained above, the parties have filed cross motions for summary judgment.

Plaintiff argues that Defendant's actions in blacklisting him and refusing to do business with him amounts to tortious interference with his contracts, business relationships and business expectancies. In addition, Plaintiff says that Defendant has defamed him.

Defendant counters that it has not tortiously interfered with Plaintiff's business relations or contracts because refusing to do business with him is not unlawful. As to the defamation claims, Defendant denies making any statements about Plaintiff, and also argues that Plaintiff has not proffered admissible evidence to support a defamation claim.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

**A.** *Elias v. Federal Home Loan Mortgage Corporation*

Plaintiff's claims are foreclosed by the recent decision in Elias's case challenging his placement on Freddie Mac's Exclusionary List. *Elias v. Fed. Home Mortg. Corp.*, No. 13-10387, 2013 WL 5372887 (E.D. Mich. Sept. 25, 2013), *aff'd* — F. App'x —, 2014 WL 3702597 (6th Cir. 2014). Elias was placed on Freddie Mac's Exclusionary List because he presented an undue risk of loss to Freddie Mac. 2013 WL 5372887, at *1. Elias challenged his placement on Freddie Mac's Exclusionary List as interfering with his contractual/business relations and constituting defamation, among other things. As to the tortious interference claim, the district court rejected Elias's claim, stating that "[a] 'mere refusal to deal' with a party does not constitute intentional interference with that party's contractual or business relations with others.' " *Id.* at *3 (citing Restatement (Second) of Torts § 766). In addition, the district court explained that there was no evidence that Freddie Mac "was motivated by anything other than its legitimate business purpose of placing persons and/or businesses on the List." *Id.* As to the defamation claim, which was premised on Elias's claim that Freddie Mac communicated to its servicers that Elias was placed on the Exclusionary List, the district court reasoned that the claim fails because the publications at issue were true, i.e. that Elias was placed on the list. *Id.* Moreover, the district court held that Elias did not plausibly allege that the purported defamatory statements were made maliciously because Freddie Mac was entitled to a qualified privilege for statements made to its servicers whom Freddie Mac owed a duty to inform of Elias's placement on the list. *Id.* Therefore, Elias's complaint was dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

The Sixth Circuit affirmed the district court's decision. *Elias v. Fed. Home Loan*

*Mortg. Corp.*, — F. App'x —, 2014 WL 3702597 (6th Cir. 2014).   As to the tortious interference claim, the Sixth Circuit agreed with the district court that Elias could not show that Freddie Mac's actions were motivated by anything other than a legitimate business reason.   *Id.* at *4.   Likewise, the Sixth Circuit held that Elias's defamation claim failed because Freddie Mac's communications were not false and were protected by a qualified privilege.   *Id.* at *5–6.

**B. This Case**

Against this backdrop, the Court considers the specific claims raised by Plaintiff here.

### 1. Counts I and II (The Tortious Interference Claims)

In Count I, Plaintiff claims tortious interference with business relationships or expectancies.   In Count II, Plaintiff claims tortious interference with contracts.   Plaintiff argues that, by Defendant choosing not to do business with him, Defendant has "caused the failure of the contracts between [Plaintiff] and his clients by making performance impossible."   (Doc. 18 at 31).   Plaintiff's claims lack merit.

The elements of tortious interference with a business relationship under Michigan law[4] are:

> [T]he existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff.

---

[4] In diversity cases such as here, this Court must apply the substantive law of Michigan as the forum state.   *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607–08 (6th Cir. 2012) (citations omitted).   If "the Michigan Supreme Court has not addressed the issue presented," the Court must "anticipate how [it] would rule in the case."   *Id.* (citing *Allstate Ins. Co. v. Thrifty Rent–A–Car Sys. Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)).

11

*Dalley v. Dykema Gossett*, 287 Mich. App. 296, 323 (2010) (citation omitted).  To constitute an "intentional interference," the defendant's conduct must be improper or without justification.  *Id.* at 323–24 (citing *Bonelli v. Volkswagen of America, Inc.*, 166 Mich. App. 483, 498 (1988)).  However, "'[w]here the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.'" *Id.* at 324 (citation omitted).  Indeed, the plaintiff must show that "the interferer did something illegal, unethical or fraudulent."  *Dalley*, 287 Mich. App. at 324.

Like tortious interference with a business relationship, tortious interference with a contract requires "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant."  *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 89–90 (2005) (citations omitted).

Here, Plaintiff's tortious interference claims fail as a matter of law because Defendant has not acted illegally, unethically or fraudulently.  Plaintiff does not have a legal right to require Defendant to conduct business with him.  As the Restatement (Second) of Torts § 766, cmt. b, informs: "Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability. . . There is no general duty to do business with all who offer their services, wares or patronage."

In addition, Defendant's placement of Plaintiff on its Watchlist was motivated by legitimate business reasons.  An investigation revealed that Plaintiff engaged in "Buy and Bail" activity—activity which Defendant does not endorse.  The investigation also showed that Plaintiff was affiliated with a company affiliated with Elias, and that he issued a questionable check to Elias containing the word "commissions" in the memo line.  And

although Plaintiff provided explanations to Defendant in an attempt to address these concerns, the council's voting members were not satisfied with his explanation and decided to keep him on the Watchlist.  All of these reasons provide a legitimate business reason for placing Plaintiff on the Watchlist.  This case is indistinguishable from *Elias*.  The tortious interference claims must be dismissed as a matter of law.

## 2.  Counts III and IV (The Defamation Claims)

In Counts III and IV, Plaintiff claims both business and individual defamation.  To support his defamation claims, Plaintiff has attached two affidavits to his reply brief from former clients stating that they were told by Defendant that Plaintiff was committing fraud in the real estate market.  In addition, Plaintiff contends that the letters sent to Plaintiff's clients informing them that their pending short sale transactions were declined because they "failed internal quality review" are defamatory statements.  Unfortunately for Plaintiff, the Sixth Circuit's decision in *Elias* renders his claim implausible.

In *Elias*, the Sixth Circuit explained:

> To succeed on a defamation claim in Michigan, a plaintiff must prove each of the following (1) "a false and defamatory statement concerning the plaintiff"; (2) "an unprivileged communication to a third party"; (3) "fault amounting to at least negligence on the part of the publisher"; and (4) that the statement either amounts to defamation per se or that it caused "special harm."

*Elias*, 2014 WL 3702597, at *6 (citation omitted).

As to the two affidavits Plaintiff relies on to support the defamation claims, they are protected by Michigan's qualified privilege.  The affidavits state that Hugo Jimenez, an employee of Defendant, told the clients that Plaintiff "was committing fraud in the real estate business with Will Elias and therefore, [Plaintiff] was not allowed to do business with

13

Bank of America anymore."  The clients were allegedly advised to find a new realtor.  If true, these statements are protected by qualified privilege.  Qualified privilege applies "when parties share an interest in the information being transmitted, or when one party owes a duty to communicate information to the other."  *Elias*, 2014 WL 3702597, at *6 (citing *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 636 (Mich. Ct. App. 1992)).  As the Sixth Circuit recently explained, the qualified privilege "can be overcome if the defendant acted with actual malice, meaning with knowledge of the statement's falsity or with reckless disregard of the truth."  *Id.* (citations omitted).

Here, the statements allegedly made by Jimenez—which Defendant denies were made—are protected by qualified privilege.  The clients were involved in a transaction requiring Defendant's participation to complete the short sale.  The clients, therefore, shared an interest with Defendant in knowing that the sale would not be completed so long as Plaintiff was involved in the transaction.  *See Elias*, 2014 WL 3702597, at *6 ("Freddie Mac and its mortgage servicers have a common interest in minimizing risk and fraud in their short-sale transactions, and the public has an interest in ensuring the integrity and stability of the secondary mortgage market, which provides liquidity for consumer loans.").  Without this knowledge, the clients would not know the reason why the short sale transaction was not closing and how to remedy the situation.  In addition, Plaintiff has failed to proffer any evidence showing that Defendant acted with actual malice to overcome Defendant's qualified privilege.  As explained, Defendant's internal investigation showed that Plaintiff was connected to Elias, and that the two were involved in questionable conduct.  *See id.* at *5 ("But these disclosures do not indicate malice in light of the fact that, *by Elias's own admission*, Freddie Mac had reason to believe that Elias was circumventing

14

its short-sale requirements and that Freddie Mac would therefore not approve the pending transactions involving these three servicers."). Therefore, to the extent that Jimenez actually told Plaintiff's clients that Plaintiff was "committing fraud in the real estate business with Will Elias," Plaintiff has failed to proffer a scintilla of evidence that the statement was made with malice. The more reasonable inference is that the statement, if made, was done to apprise the client of what to do in order to close the pending short sale.

As to the letters sent to Plaintiff's clients who had pending short sale transactions, Plaintiff has not shown any falsity in the statements amounting to defamation. As explained, the letters stated that the request for a short sale was declined due to "failed internal quality review." Plaintiff says that this amounts to defamation because his clients could have only assumed that the transaction was rejected because of Plaintiff's shoddy work or because of something to do with Plaintiff's capabilities. Plaintiff is wrong. The letters make no reference to Plaintiff and cannot support a defamation claim against him because they did not contain a false statement. *See Elias*, 2014 WL 3702597, at *6. Defendant communicated to Plaintiff's clients that the short sale transaction they were involved in was declined, and, the reason why it was declined—it failed Defendant's internal quality review. Plaintiff has not shown anything improper with the decline letters.

In addition, even if Plaintiff could rely on the e-mail from Beatenhead to Flynn in which Beatenhead says that Flynn told him that Plaintiff was not permitted to close sales with Defendant, this is not defamation. The statement is true. Plaintiff was not permitted to close sales with Defendant because he was placed on the Watchlist. As such, when Beatenhead communicated as much to Flynn, he did nothing wrong. In any event, the e-mail is inadmissible hearsay.

15

**IV. CONCLUSION**

For the reasons stated above, Plaintiff's Motion For Summary Judgment (Doc. 18) is DENIED; Bank Of America, N.A.'s Motion For Summary Judgment (Doc. 19) is GRANTED; and this case is DISMISSED.  Although Plaintiff believes that he properly addressed all of Defendant's concerns and should not have been placed on the Watchlist, Defendant's voting Watchlist council members disagreed.[5]

SO ORDERED.


 S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  August 7, 2014


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 7, 2014, by electronic and/or ordinary mail.


S/Sakne Chami
Case Manager, (313) 234-5160

---

[5] Defendant's motions to strike certain exhibits (Docs. 31, 42) are DISMISSED AS MOOT.  In addition, Plaintiff's motion for default judgment (Doc. 35) related to Defendant's purported failure to comply with discovery is DENIED.  Having reviewed the papers, the Court is satisfied that Defendant has complied with its discovery requirements.  The Court also declines to award Defendant attorneys' fees and costs under 28 U.S.C. § 1927 for having to respond to Plaintiff's motion for default judgment. The Court has considered Defendant's request and finds no basis for awarding attorneys' fees and costs under § 1927.